994 F.2d 868
 143 L.R.R.M. (BNA) 2729, 301 U.S.App.D.C. 321
 FEDERAL LABOR RELATIONS AUTHORITY, Petitioner,
v.
UNITED STATES DEPARTMENT OF JUSTICE, Immigration and
Naturalization Service, United States Border
Patrol, San Diego, California, Respondent.
 No. 91-1353.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 16, 1993.
Decided June 15, 1993.
 
 Application for Enforcement of an Order of the Federal Labor Relations Authority.
 Pamela P. Johnson, Atty. Federal Labor Relations Authority (FLRA), argued the cause for petitioner. With her on the briefs were David M. Smith, Sol., and Arthur A. Horowitz, Associate Sol., FLRA. William E. Persina, William R. Tobey, and Denise Morelli also entered appearances for petitioner.
 William C. Owen, Atty. Dept. of Justice (DOJ), argued the cause for respondent. With him on the briefs were Stuart M. Gerson, Asst. Atty. Gen., and William Kanter, Atty., DOJ.
 Before WILLIAMS, SENTELLE, and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 Concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.
 SENTELLE, Circuit Judge:
 
 
 1
 The Federal Labor Relations Authority ("FLRA" or "Authority") petitions for enforcement of its order requiring the Department of Justice, Immigration and Naturalization Service, United States Border Patrol, San Diego, California ("Patrol" or "Agency") to bargain with the Union representing its employees over impact and implementation of a relocation affecting employees of the Patrol's San Diego sector. The Authority contends that the Agency is in noncompliance by not having negotiated on the Union's proposal to use space vacated in the relocation for a Union office, when no such office existed before. The Agency replies that this proposal is not within the scope of the underlying proceeding. As we agree with the Agency, we deny the petition.
 
 BACKGROUND
 
 2
 The National Border Patrol Council of the American Federation of Government Employees, AFL-CIO (the "Union"), is and was at all times relevant to this opinion the exclusive representative of all nonexcluded personnel of the United States Border Patrol. By letter of March 30, 1988, the Patrol notified the Union's Local 1613 of plans to relocate its San Diego sector Anti-Smuggling Unit ("ASU") from the sector's headquarters to three decentralized locations in San Diego County. At an April 4, 1988 meeting, management explained the relocation plans to Local representatives. Thereafter, the Union wrote to sector management expressing support for the decentralization decision, but requesting bargaining over the "impact and implementation" of the decision. After an exchange of correspondence, the Union requested information as to the projected future use of the space being vacated in the headquarters building. Management took the position that this question was outside the scope of current bargaining.
 
 
 3
 On August 30, 1988, the Union submitted a list of proposals, for the most part dealing with the impact and implementation of the relocation, but including Proposal H, which specified that:
 
 
 4
 The Agency will provide the [Union] ... with office space in the building to be vacated by the Anti-Smuggling Unit. Such office space will be at least 400 square feet in size, with locking doors, and will be accessible 24 hours a day. Additionally, the Agency will provide the Union with a separate FTS telephone line for such office. The aforementioned accommodations shall be provided at no cost to the Union.
 
 
 5
 Management responded the next month by letter. With regard to Proposal H, it stated that "this item does not have impact on the decentralization of the Sector Anti-Smuggling Unit."
 
 
 6
 In October of that year, management informed the Union that it intended to relocate staffs of other Agency departments to the vacated space, but that it had not made definite plans for reconfiguring the space. The next month, the Agency advised the Union that the ASU staff had not yet been relocated. There were no further communications between the parties regarding the relocation of the ASU until after the Sector had moved the ASU agents into the new offices in three stages, in January, February and March 1989.
 
 
 7
 After the relocation of the ASU agents, the Union submitted a revised list of proposals, not repeating Proposal H, but substituting Proposal "I," which provided that "[t]he Agency agrees to notify the Union and bargain completely regarding the proposed use of the old Anti-Smuggling facilities and parking accommodations prior to affecting [sic] changes in those areas." The Agency responded that it anticipated relocating the Personnel Section to the area vacated by the ASU. The Union wrote back on March 27, 1989, demanding to bargain fully "prior to any further remodeling being done."
 
 
 8
 Management provided floor plans to the Union, and the parties met April 10 to discuss the Union's concerns. During this meeting, the Union submitted another set of proposals, including another Proposal "I," which stated that "[t]he Union would also like to renew its request for the use of an office in one of the buildings the moves are affecting," without specifying which building. Three days later, the Union mailed yet another set of proposals to the Agency. This list included a third and more specific Proposal "I" which duplicated the original Proposal "H," differing only in the location of the space the Union wanted for its office. This time the Union requested space in the building being vacated by Personnel, rather than in the area where the ASU had been located. Management responded with its "last best offer" on April 17, answering the latest Proposal "I" by agreeing "to abide by the provisions of Articles 8 and 11 of the Negotiated [Master] Agreement," which provide respectively that office space will be made available for Union meetings on request subject to availability, and that national Union representatives shall be permitted access to all Agency installations.
 
 
 9
 The Union notified the Agency that it continued to disagree with management's plans, and demanded further negotiations. The Patrol completed remodelling of the vacated ASU facilities and moved its Personnel employees into that space. The Property and Procurement Unit, which had previously shared the ASU space, was relocated in the space in the other building vacated by Personnel.
 
 
 10
 On May 17, 1989, the Union filed unfair labor practice ("ULP") charges, and in August, the General Counsel issued a complaint alleging that the Agency had "changed the working conditions of unit employees ... by remodelling vacated facilities and relocating employees to different work locations without fulfilling its bargaining obligation with the Union over the impact and implementation of the changes."
 
 
 11
 The complaint does not expressly refer to the Union demand for office space. Charging portions of the pleading allege only that the Agency changed the working conditions "by unilaterally decentralizing the [ASU] ... without first completing bargaining with the union over the impact and implementation of the changes," and refusing to bargain in good faith with the Union.
 
 
 12
 Thereafter, an Administrative Law Judge ("ALJ") heard the matter and determined that the Agency had violated section 7116(a)(1)(5) of the Federal Service Labor Management Relations Statute ("the Statute"), 5 U.S.C. § 7116(a)(1)(5). United States Dep't of Justice, INS, U.S. Border Patrol, San Diego, Nos. 8-CA-90398 and 8-CA-90411 (ALJ July 13, 1990). The ALJ ordered the Agency, in addition to meeting posting and notification requirements, to bargain with the Union "over the impact and implementation of the decentralization of the ASU," and "the impact and implementation of the relocation of the employees and the remodeling of facilities ... at the San Diego sector headquarters." Id. at 20. He entered no explicit order addressing the Union's request for office space. Pursuant to5 C.F.R. § 2423.26(3) (1993), the ALJ informed the parties that exceptions to the decision must be filed on or before August 13, 1990. See 5 C.F.R. § 2423.26(c) (1990). When the Agency did not file exceptions to the ALJ's decision and proposed order, the Authority adopted the ALJ's decisions and directed the Agency to comply with the ALJ's order. United States Dep't of Justice, INS, U.S. Border Patrol, San Diego, Nos. 8-CA-90398 and 8-CA-90411 (FLRA Aug. 20, 1990). The Agency did not request reconsideration.
 
 
 13
 After issuance of the Authority's order, the Agency resumed bargaining with the Union over the "impact and implementation" issues that remained unresolved. Several specific issues relating to the relocation were resolved. However, the Union continued to press an amended Proposal, "J," for a permanent Union office.[1] This proposal contained a number of additional specifications for the space, including minimum measurements and provision of a separate phone line for electronic communications beyond those in Proposals "H" and "I." The new proposal provided that the office could be located in any building in the sector's headquarters compound so long as the building possessed amenities conforming to the new requirements.
 
 
 14
 The Agency refused to bargain over Proposal "J," asserting that the decision and order did not require it to do so. The Union complained to the FLRA's Regional Counsel about the Agency's refusal to entertain Proposal J. The Counsel wrote the Patrol to inquire why it was not carrying out the Authority's order. The Agency responded that the order did not require it to negotiate over this proposal, noting that the original complaint, the Authority's ULP findings, and the order are all directed to failure to complete bargaining over impact and implementation, as required by 5 U.S.C. § 7106(b)(2) and (3). It also pointed out that the General Counsel had never asserted that Management's refusal to entertain the Union office proposals constituted a redressable violation. Finally, the Agency asserted that because Proposal "J" was an attempt to negotiate over a subject controlled by Article 8 of the parties' Master Agreement, it had a right to insist to impasse that any attempt to expand on the provision for Union office space contained in Article 8 be negotiated at the national rather than the sector level.
 
 
 15
 The FLRA then brought this enforcement proceeding.
 
 ANALYSIS
 
 16
 The Agency argues that because the Authority ordered it to bargain over impact and implementation only, it has not violated the order the Authority entered against it unless its refusal is within the scope of the term "impact and implementation" bargaining. In support of this position, the Agency points out that the General Counsel's complaint in the original unfair labor practice proceeding did not charge it with refusing to bargain over the provision of an office to the Union where there had been no Union office before. The Agency asserts that its refusal therefore is not within that scope. We agree.
 
 
 17
 As a matter of background law, impact and implementation bargaining arises as an exception to the management rights doctrine created by section 7106(a). That doctrine limits the general agency obligation to bargain under the Statute by reserving to management officials the authority to, inter alia, make budget, organization, and work assignments. Section 7106(b), however, establishes that this section does not preclude an agency and a labor organization from negotiating "procedures which management officials of the agency will observe in exercising authority under" that section or "appropriate arrangements for employees adversely affected by the exercise of [such] authority." In other words, "although an agency is not required to bargain with respect to its management rights per se it is required to negotiate about the 'impact and implementation' of those rights...." Department of the Navy v. FLRA, 962 F.2d 48, 50 (D.C.Cir.1992).
 
 
 18
 In short, by case law and statutory reference, the term "impact and implementation" includes only the "procedures which management officials of the agency will observe in exercising" management rights and "appropriate arrangements for employees adversely affected by the exercise" of such rights. 5 U.S.C. § 7106(b)(2)(3); see also Department of Navy, 962 F.2d at 50. It is not apparent that the disputed subject matter fits within either of those subsets.
 
 
 19
 It would seem clear that the creation of an office for the Union has nothing to do with the procedures used by management for the resource and personnel allocation involved in the decentralization of the unit. While the term "appropriate arrangement for employees adversely affected by the exercise" may be a bit more amorphous, it is not sufficiently so to engulf the present controversy. In United States Department of Interior v. FLRA, 969 F.2d 1158 (D.C.Cir.1992), we discussed the meaning and the scope of the phrase. We noted there that "in earlier decisions ... involving Section 7106(b)(3), we have reviewed union proposals to assist employees harmed by some management action." Id. at 1162. We declined to extend the scope of the term to include proposals not designed for such purposes.
 
 
 20
 We further held that the teachings of Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), do not permit the Authority to extend the reach of that subsection. As is well known, and often quoted, Chevron does require us to afford an agency, such as the Authority, great deference in its interpretation of an ambiguous statute entrusted to its administration. However, Chevron teaches first that "if the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781. Because we read section 7106(b)(3) "as unambiguously applying only where the FLRA has identified the reasonably foreseeable adverse effects that will flow from some management action, 969 F.2d at 1162, we did not afford Chevron deference to the agency to apply the subsection absent that condition, nor do we now.
 
 
 21
 In Department of Interior, we denied enforcement of orders requiring agencies to bargain over certain details of drug abuse testing programs. Although no one challenged the Authority's argument that the proposal could succor "employees who suffered adverse effects," we held that such a proposal did not constitute an "appropriate arrangement" within the meaning of section 7106(b)(3) because it extended to all employees, not only to those adversely affected by the exercise of the management right. Here, there is no showing--nor does it appear that there can be one--that this new office proposal assists adversely affected employees, let alone that its assistance is limited to such employees.
 
 
 22
 Rather, it appears that this case is closer to United States Dep't of Treasury v. FLRA, 960 F.2d 1068 (D.C.Cir.1992). There we held that there was no appropriate arrangement for adversely affected employees where the proposal in question was one that would confer a benefit, and the only adverse effect was that flowing from management's denial of the proposal. In other words, we reaffirmed the underpinnings of the concept expressed in paragraph (b)(3) that to be within the exception, "the proposal must address adverse effects flowing from the exercise of a protected management right." Id. at 1073. In Dep't of Treasury, we vacated the Authority's conclusions that a benefit proposal came within the appropriate arrangement exception, stating that "the FLRA appears to have accepted a bootstrap argument, whereby the union proposes a benefit (higher pay for certain details lasting less than one pay period) and employees experience an adverse effect (lower pay) when management denies that benefit." Id. Here the Authority has gone the Dep't of Treasury case one better--or one worse--in that the proposal in question does not even describe a benefit for individually affected employees, the denial of which could be bootstrapped into an adverse consequence. Rather, it would confer a benefit on the Union as a whole, one more bootstrap away from precedentially established concepts of appropriate arrangements. We therefore conclude that the Authority's argument that the new office proposal is within its "impact and implementation" order is without merit.
 
 
 23
 The Authority argues nonetheless that we should allow its petition for enforcement on a waiver theory. Specifically, the Authority asserts that the Agency has raised its argument that Proposal J is not within impact and implementation bargaining for the first time in this Court and therefore that we are without jurisdiction to hear it. As the Authority notes, 5 U.S.C. § 7123(c) provides: "No objection that has not been urged before the Authority ... shall be considered by the court, unless the failure or neglect to urge such an objection is excused because of extraordinary circumstances." As the Authority further notes, the Supreme Court has applied that section by its terms and in EEOC v. FLRA, 476 U.S. 19, 23, 106 S.Ct. 1678, 1680, 90 L.Ed.2d 19 (1986), held that "under section 7123(c), review of 'issues that an agency never placed before the Authority' is barred absent extraordinary circumstances." Id. at 23, 106 S.Ct. at 1680 (quoting Dep't of Treasury v. FLRA, 707 F.2d 574, 579 (D.C.Cir.1983)).
 
 
 24
 The Agency's argument, however, is not jurisdictionally barred. Whether an enforcement proceeding comes within the terms of an existing bargaining order cannot be raised at the time of the entry of the order. The Authority asserts that the Agency should have objected to being ordered by the Authority to engage in bargaining over the use of a portion of its space as a Union office during the pendency of the ALJ's proposed order, and before its adoption by the Authority. The difficulty is that neither the Agency nor any other litigant could be expected to object to something that the order did not contain. The same is true of the Authority's final order adopting the ALJ's conclusions and disposition.
 
 
 25
 The Authority's invocation of the jurisdictional bar discussed in EEOC v. FLRA is inapposite. That case bars the raising for the first time of issues never placed before the Authority, but in any enforcement proceeding, there is an automatic issue as to whether the relief sought before us is within the order sought to be enforced. Insofar as section 7123(c) is applicable, we note that it provides an exception when the "failure or neglect to urge the objection is excused because of extraordinary circumstances." Id. As we have previously noted, " 'extraordinary circumstances' exist when the Authority itself raises an issue at the time of its order." United States Dep't of Interior v. FLRA, 969 F.2d 1158, 1161 (D.C.Cir.1992). Here, if it is properly said that the bargainability of the Union's office space proposal was raised after the order was issued by the Authority, it was raised by the Authority rather than by the Agency. In short, we find no jurisdictional bar to our consideration of the merits of the Agency's claim that the office space was not within the scope of the Authority's impact and implementation bargaining. As there is no bar to consideration, and as the Agency's defense to the enforcement proceeding is well taken, the petition for enforcement is denied.
 
 
 26
 STEPHEN F. WILLIAMS, Circuit Judge, concurring:
 
 
 27
 I agree with the court that the union demand for office space was not within the scope of the term "impact and implementation" bargaining and that the border patrol did not waive the issue as to the scope of that term as used in the bargaining order. I write separately only to address a related argument that the FLRA raised rather obscurely, namely, that various communications among the parties established "impact and implementation bargaining" as a term of art that encompassed more than its usual content. See FLRA Brief at 22-24.
 
 
 28
 In support of this proposition the Authority points to two meetings between the union and the agency. At the first, on July 5, 1988, the union inquired about the proposed use of the facilities to be vacated and the agency responded that this matter was outside the scope of the bargaining about the impact and implementation of the decentralization. Joint Appendix ("J.A.") 275. At the second, on October 18, 1988, alluded to briefly at pages 869-70 of the majority opinion, the union again raised the issue of the proposed use of the vacated facility. The border patrol, rather than reaffirming its earlier position that this issue was outside the scope of bargaining, instead responded that "the proper time to address those concerns is when changes are proposed." J.A. 299. According to the FLRA, this response was an implicit agreement by the agency to treat the issue as within the scope of impact and implementation bargaining.
 
 
 29
 In principle, I see no reason why the parties could not include within the phrase "impact and implementation bargaining" whatever content they chose. However, because the phrase has a sufficiently defined scope, and because, as the majority opinion explains in detail, the proposal in question is so clearly outside that scope, only very explicit and unambiguous evidence could sustain the view that the parties had assigned the phrase the meaning now claimed. The evidence to which FLRA points is simply not enough.
 
 
 
 [1]
 Proposal J provides that:
 The agency agrees to provide the Union with an office in the San Diego Sector Headquarters Compound. Such office will be fully enclosed, with a solid core door equipped with a dead bolt locking mechanism, and will be accessible to Union 24 hours a day. The size of said room shall be no less than 400 square feet. The office shall be equipped with electrical circuitry sufficient to run standard office equipment and electrical power shall be supplied at no charge to the Union. Said office will be fully furnished, and repair and maintenance thereof will be provided at no charge to the Union. There also shall be ready access to restrooms, fresh drinking water, and a lunch room. There shall also be two (2) FTS telephone lines provided at no cost to the Union, one for voice communications, and the other for electronic communications. Such telephone lines will be configured so as to preclude monitoring from other service telephone lines.